Good morning. We'll call our first case, our only case for the day, George Kontonotas v. Hygrosol et al. Good morning, Your Honors. Alicia Hickock from Drinker, Biddle, and Wreath on behalf of Hygrosol Pharmaceutical Corporation. I'd like to reserve three minutes for rebuttal. That's granted. And Your Honors, I was informed that we are actually arguing both the appeal and cross-appeal in the primary argument, so I'm prepared on both counts. That's fine. Your Honors, as I was reviewing and updating the case law in this case, I was struck by a sentence in LaBaio v. Best Buy, which is the contract for a, not a contract, maybe a contract case that was decided on a motion to dismiss in the Southern by Mr. Kontonotas. And in that case, they set forth the principles for unjust enrichment, and when they do, they say that the law abhors unjust enrichment. Now, the law may abhor unjust enrichment, but when the facts show that there have been promises made of payment, and you will be compensated, etc., etc., over and over again, I mean, there are facts here, and unless we find clear error on the part of the district court judge, how can you succeed in overturning the quantum Merowit award here? Your Honor, let's parse out what those facts are. There are maybe three categories that you might call as facts of payment over and over. The first is the September 1997 letter. Yes, which is very clear. Actually, Your Honor, it's not very clear. If you look at that letter, and it's AIA 1729, the first paragraph of it says, this letter serves as a verification of Hygrosol's recognition for your contribution in locating a possible contact with Mutual Pharmaceutical Company, Inc., related to our Liqui-Solid technology. Should an agreement consummate with said company, Hygrosol Pharmaceutical Corporation will give you a fair commission fee for your efforts. All right, and thereafter, they just refused to do that, and did not, did not offer, did not volunteer money when they were, when they got paid. Actually, Your Honor, that's not correct. Thereafter, they held a meeting, and after they held a meeting, they entered into a contract between Hygrosol and Mr. Contenotus. That had nothing to do with facilitating a meeting. Actually, that's not true, Your Honor. Where in the broker's agreement does it mention the introduction of the parties, an agreement that comes from the introduction of the parties? Your Honor, if you look at Section 1.2, and I'm now at JA 136, I believe. In Section 1.2, it says, no commission will be payable for sales to pharmaceutical companies. Sales? Yes, that's correct. Sales. And the broker does not have a license to market the products, which is a defined term. Marketing the products, yes. And it goes on, and at the end, it says, other than the current agreement, which is being negotiated with mutual pharmaceuticals. We're talking about the sales and marketing of products, the products being defined as the nutritional products here. This is, this is about facilitating a meeting, the, the September 6th letter. Let me ask you a question, since we're on facts, and following up on Judge Mandel's question, before we get bogged down in the law. Because of Contenatus' efforts in facilitating a meeting, your clients made $141 million plus just between the first quarter of 2001 and the last quarter of 2009. Is it fair that he gets nothing? Yes, Your Honor. How so? Because when he entered into a contract, he entered into a contract to protect his business. He was a nutritional salesman. He was a person who had approached Mutual in August of 1997 and met with them about nutritional products. No, but the, the meeting with Mutual was all about pharmaceuticals. I mean, Robert's testimony and what the court, the court credited that. You've got a clear error standard here. Your Honor, the court said, I do not credit the fact that only pharmaceutical products were discussed. I note that CoQ10 was discussed and that CoQ10 had been discussed at the Friedman meeting before that, and that even Dr. Roberts, who was Mr. Contenatus' own witness, said repeatedly that Dr. Spirez had tried and tried to convince him to produce CoQ10. Therefore, it was not a meeting that concerned only pharmaceuticals. Well, let's go back to the September 6th letter that you have discussed. That talks of an agreement. That agreement could be either as to nutritionals or as to pharmaceuticals. It does not segregate or separate or identify an agreement. And then the April 98 margin notes are made next to, in paragraph 4.4, I think, on a pharmaceutical agreement, correct? The licensing agreement, a draft licensing agreement which dealt only with pharmaceuticals. That's not correct, Your Honor. Yes, it is. It is. The products, as products, capital P, is nutritional. It's nutritional. Game is set and match. No. The April 1998 agreement, Your Honor, if you look at the, if I can go. I'm looking at the December 2nd, 1997 agreement. For the licensing agreement? That's the licensing agreement. Oh, I'm sorry. I'm not looking at that. There are three drafts of the, there are three versions of the licensing agreement that are in the record. There's a December 1997 one which says nothing. Excuse me. Go ahead. It says nothing whatsoever about pharmaceutical products. It says that Hygrosol will develop a product. When it develops a product, it will then offer it for sale and Mutual will get the right of first refusal. In the April 1998 draft, which is, as you can see, a black-lined version that changes completely the way that the terms of the deal were being proposed to Hygrosol, it says now instead of Hygrosol developing a product and bringing it to us when it's viable, Mutual wants the right to say what product will be viable in conjunction with Hygrosol. Are you suggesting, because if you are, this is the first time I understood this to, I'm understanding this to have been said by your side in this case. Does not the licensing agreement have to do with pharmaceuticals? No, but what is true is that the only things that were produced under the licensing agreement were pharmaceuticals. That's the only thing that was produced under it, but it was not a limited agreement. Well, then let's, even assuming you're, I know that's correct. That's undisputed here. The only thing that was produced were pharmaceuticals. That's correct. And the margin notes in the draft agreement of April 1998 talked about the first five products. That's correct. Which means pharmaceuticals to me, since that's all that was being produced. Do you dispute that? Yes, because it said that the first five products were totally undefined, would be agreed upon between them. A nutritional product could come to market very quickly. A pharmaceutical product on the other hand, if you look at it, this deal was entered into in the middle of 1998. There were 26 products contracted for. Of the 26, only three of them came to market in 2001 through 2004. The third product didn't come until 2004. Well, why would they have this note agreement about nutritional products when there was a separate agreement with George on nutritional products as the exclusive broker? I mean, that makes no sense. And there were three products produced pursuant to this agreement. Why does that note not have to do with those three products from which $141 million was made? Your Honor, the reason that it doesn't, first of all, is because it's in a draft. It did not go to the final document. Well, that shows, I mean, we have lots of showing of intent here to compensate. And we have Robert's statement that, you know, this is Spiraeus' M.O. This is what he does. He promises, he promises people deliver and then he won't perform. And this looks like is more than his promise in September of 97. This is him telling the other entity, you know, George should get something out of this. And I'm wondering whether the 2.5 to 5 percent wasn't from each of them. So it would be 5 to 10 percent, which seems to make more sense. I mean, who gives 2.5 percent commission? All we talked about here was 10 and 15 percent seemed to be bandied about. I mean, I just don't understand your argument. Your Honor, I think you hit on it when you said that this looks like something where he's trying to get both parties to have an obligation here. What he's saying is the course of what we're doing, which has not yet been reduced to a contract, is moving forward in a strange way. And I wonder if we should find a way to give Mr. Contenota something for that. Where is this explanation in the record? Where is anything in the record that detracts from the force of this notation? Does Piraeus testify somehow that this, you know, was not something that was, you know, something anticipated or intended by him? He did, Your Honor, but the court did not credit his testimony in that regard. And that becomes a finding of fact, the credibility. Credibility is there. That's why we did not dispute it on appeal, Your Honor. But if you look at the note itself, and you look at the way it's characterized in the opinion, the court says, well, there's parts of it that are illegible. It's a handwritten notation. It is classic parole evidence. Counsel, I think we better move to the law, because we're arguing a lot of facts here, and I think you're better chance, I guess, and we've directed you towards that, perhaps, but perhaps the law where I think there might be a better chance. Absolutely, Your Honor. The reason that New York law is so antithetical to unjust enrichment is that it wants, as does every other place in this country, to encourage people to enter into a contract. And when you enter into a contract, you may specify rules that govern between you and the other person so that you have a clear statement that can come before a court and be enforced. Well, really, the New York law is suspicious of perjury and suspicious of people making up agreements that just don't exist at all, agreements that are made out of whole cloth. Here, we have substance that shows that that worry, if you will, of the New York courts is not implicated. Actually, Your Honor, that's as to the statute of frauds, where they're concerned about perjury. What they're concerned about as to the unjust enrichment is, did the parties reach an agreement that they reduced to a contract form? They did reach an agreement. They did reduce it to a contract form. The parties reached an agreement on nutritional products. That is the broker's agreement. That's what the district court found. The district court found that they decided in the broker's agreement to limit compensation to nutritional products. There is nothing in the September 1997 letter that says, this is only an agreement about pharmaceutical products. It says, we will reach an agreement for how you will be compensated. I could be a violinist, and I could go to the Nashville Symphony, and they could say, I'm not going to hire you to be a concert violinist. If a country music performer sits there and listens to me and hires me to be there, I'm being paid for something different. It may still be that I'm performing a service, but it's a different service. There is an exception to the New York law on quasi-con, where there is a contract, a valid contract. There is an exception for that contract prevailing if something is distinct from, if it covers a subject or a topic that is distinct from the contract itself. There is no basis for saying that that broker's agreement has anything to do with pharmaceuticals. Your Honor, let's put five minutes on, and we'll give your opposition the same additional amount. Your Honor, the fact is that the September 1997 agreement said, there will be a meeting with Mutual. There will be a contract that will come out of it. There was a contract that came out of it. There's nothing in the September 1997 letter that says, I'm only talking about pharmaceutical products. No, that's right. There are numerous cases where the court says, if the relationship of the parties is governed by a contract, that contract precludes a claim in unjust enrichment, even when the contract itself does not provide relief. And, in fact, Your Honor, there have been several cases decided even since we briefed this. There's a Southern District of New York case, Kimberly Steele v. Watch Hill Management Corporation, that was decided just this January. Ms. Higgins, were these provided to the other side? No, Your Honor. I was just researching. I can do a supplemental memorandum. Do that in a letter, if you have additional cases, so the other side can comment on that. Let me ask you, did the magistrate judge make a particular finding as to whether the party's entire relationship was covered by the contract? He said that in the contract, they chose to limit their relationship, their payment, to nutritional products. All right, the payment, but does the contract itself govern the entire relationship, including both pharmaceuticals and nutritionals? Yes, Your Honor. Did he make a finding, though? Your Honor, he said that there was an integration clause, and the integration clause was binding. Well, but he clearly said that this, that pharmaceuticals were distinct. He did that as the basis for giving the quantum memorandum. And the integration clause only dealt with nutritionals. It didn't deal with pharmaceuticals. That's not correct, Your Honor. It dealt with products. It used the word products. Your Honor, in one sentence, the second one said there is no other agreement between the parties. Other than this agreement. That's correct. How can there be, if I have multiple agreements, I need to say that there are other agreements. Regarding the products. No, Your Honor, it didn't limit it to products in that clause. Again, we're arguing facts. Could you talk about attorney's fees, because I found that the attorney's fees argument that you were making really didn't fit, because the broker's agreement does relate to product, and the attorney's fees provision talks about a circumvention relating to the products, capital P, which is nutritional. I don't see how you can craft that. It seems like you want to use the agreement for some purposes and not for other purposes. How can you craft that as being related to pharmaceuticals? Your Honor, the way that, is because of how he pled this and how he litigated it. He brought this case as a contract case. He said in his own pleadings, you only go to unjust enrichment if the contract is too indefinite to be enforceable. This contract guarantees me commissions, and I want my commissions under the contract. In fact, even in his brief, he continues to say, I want 15%. And because he brought this as a contract case, he has said, I'm invoking the contract. He attached it as his right. Okay, let me interrupt you. The very first sentence of 2.2 of the no circumvention section says, if the company circumvents the broker and receives a payment for the products from a customer, the products here were nutritionals only as defined in the broker's agreement. The company never received payment for nutritionals. Doesn't it seem on its face this provision doesn't apply? Your Honor, then that provision should have barred the suit from the beginning. But that's the only provision on which you can get attorney's fees. Attorney's fees are not mentioned elsewhere in the broker's agreement. That's correct. Only for violation of the no circumvention clause, which is not applicable. Which says, if you bring litigation on that point. Yes, circumvention has to be shot at for that reason. On circumvention. He told Judge Dalzell that Judge Dalzell could not grant a motion to dismiss because it was not clear that the products that were being sold were health and nutritional products. Therefore, all of the litigation that ensued after that point was because of his representation that these products fit under this contract. Well, but an awful lot happened after that, and an awful lot went to trial, and an awful lot's been found in the district court. And we didn't prevail on the contract claim. We did prevail on the contract claim. We prevailed on the contract, but you did not prevail on the no circumvention. You didn't prevail. Counsel, if you want to sum up, and then we'll hear from you on rebuttal. Yes, Your Honor. Your Honor, he entered into a relationship, Mr. Contenotus entered into a relationship with Hyversol. At the time, he was a nutritional broker. He had much to gain from nutritional sales. The court found that he was a nutritional salesman. He wanted to protect his rights. After the September letter, there was a meeting. At the meeting, both pharmaceuticals and nutritionals were discussed. After the meeting, he entered into a contract, and he said, I want to protect my rights vis-a-vis mutual, but I only care about nutritional products. The fact that after that, and years after that, there turned out to be an opportunity in an area that he did not bargain for, does not entitle him to money for something he did not consider important enough to protect in his contract. All right, thank you very much, Ms. Hickock. We'll hear from you on rebuttal. Good morning. I'm almost afraid to say anything. Well, how about this? Section 8 of the contract says arbitration. Did anybody invoke arbitration, and does the mere presence of that arbitration clause deprive us of jurisdiction? Nobody invoked it. Isn't it mandatory? And it certainly wouldn't preclude the quasi-contract claim, because the quasi-contract claim has nothing to do with capital P problems. Let me start off with something, if I might, that just made sense to me before I walked in here. And, Judge Randell, you said it makes no sense. I'm going to tell you what makes no sense to me in this case. It's April 7th, 1998, you're Spiris Spireus. You've spent all of your life, most of your life, developing liquid solid technology. You finally find a manufacturer. You've hired brokers. You've looked for a way to make money with this. You've finally found somebody. You've been introduced to somebody. You're in the process of negotiating a contract where you're going to make millions of dollars. And on April 7th, 1998, in the middle of these transactions going back and forth, what you do is you decide a smart thing for you to do would be to write a note in the margin. And you're going to write a note in the margin, having already entered into a broker's agreement, having already written a letter on September the 7th, and you're going to say, and I'm going to paraphrase, I'm not going to quote from it, I think we should pay Contenados for the introduction two and a half to five percent. Why would you do that? You would do it, and this is probably the most important part of this case, in my opinion, and I just want to quote from one part of the testimony, which can be found at JA 1600. And this is Magistrate Hart asking Spiros Spireus a question. And he says, we know, I understand, I'm no idiot, that note you wrote in the margin of the draft is a very important piece of evidence in this case. We all know that. You were asked yesterday, I don't remember if it was me or Mr. Behaver or Mr. Fioravanti, what you were talking about in that note. You remember that? And at one point I wrote in my notes that when you wrote down the next five products, you really meant five nutritional products. That's what you said. The witness, that's the truth. What the judge found is that was a lie. Well, you're saying that he already had a nutritional products agreement, so why would he write that in the margin? Is that the idea? And I'm also saying, most importantly, that the judge determined that that was a lie. Specifically, he says on page 28 of his opinion, I do not credit Spiros' testimony that he was thinking only of nutritional products. Secondly, if I could finish this, he says about his credibility, I cannot credit Spiros' suggestion that he met with Mutual as a personal favor, which is what his testimony was on JA 1482, in light of the September 6th letter. And the third thing he says is I cannot credit Spiros' testimony that the first five products included those that were never marketed. So he finds no credibility on what I think, these are not side issues. These are the heart of the case. All right, let me ask you a question. There is a pleading, a paragraph in the complaint that talks about the repeated assurances given by Spiros. Now, we've got a pretty long time frame here. Eight years. Eight years, a long time frame before kind of a light bulb goes on and somebody, I guess Roberts, acts at a meeting like she couldn't realize that Contenatus didn't know about all this money being made. Is there detail in the record as to what exactly was asked by Contenatus and what was said by Spiros over this time span? Because the court found, you know, fraudulent inducement or tolling, whatever, equitable tolling. What is there specifically that lets us say, oh, you know what? It's okay. He was lied to. He was misled. He had no reason to question. What is there specifically in the record, if you can tell us? This record is replete with statements that Contenatus, in his direct testimony, indicated that. What's the replete and what time frame? Because I found a couple of very conclusory statements, but not as to, oh, and then again in 2001, and then again in this, you know, all along, 2002 and 2003. Because we've got a statute here that it's kind of important what was said when, isn't it? Well, I guess the, yes, the statute's important. Of course the statute's important. And the issue is whether or not there was a lulling. How many times do you have to ask and how frequently do you have to ask it? And I guess the more important question would be, why were you waiting? And the testimony, and I'm sorry, I'm not going to be able to. It may be, but we want to try to fix the times that, when did he inquire? I mean, it seems more generalized. You know, he frequently asked. Yes. But when? Well, I can't tell you off the top of my head from the record when and where. I can remember a couple of instances. He testified that what happened is that Mr. Spiraeus stopped communicating with him, wouldn't return his phone calls. So he went to Mr. Batsalakis. Mr. Batsalakis is the person who introduced him the first time and said, would you please have Spiraeus call me? So it's kind of like, why are you asking somebody who's not returning your phone calls? He then goes to Roberts and says to Roberts, what's going on? Because I think there's something happening here. So it's hard to communicate with a wall. And then when he finally, what the critical thing is, is that he finds out on his own that money was made. Because he knew in June of 98, he certainly knew no later than October of 98, that an agreement had been signed, that the licensing agreement had been signed, correct? Yes, he did. So why shouldn't the statute of limitations accrue from that point? Because of some sort of a benefit? Not really. The benefit, the court determined in cited cases to support this, was that the benefit accrues when the money is made. So that you can't. Well, that's probably true of a commission. But what about your September 6th latest letter where it says, should an agreement consummate with said company, Hydrosol will give you a fair commission fee, which is almost, in my view, something like a finder's fee for your efforts. Mm-hmm. Supposing he had filed suit in June of 98 or October of 98, after he learned that the agreement had been signed, how would you expect the district court would have valued his service at that time? We'd be down on the street. So the introduction had no value? No. I think that we wouldn't have been able to prove damages. Because I think that the damages issue is critical, that money being made is critical. Because you couldn't foresee how much money this all would turn up. No, no. And that's what the defendant was telling him. He was saying, wait, it's not the right time. The right time being when I make money. Oh, I don't. Okay. Are you urging that the 1.25% was erroneously determined by the court? No. No. And the other thing I forgot to mention to you, I'm withdrawing from your consideration the second element of our cross appeal, which is the future payments. Well, that was only five sentences anyway, five lines. It didn't take us that long to read it. It shouldn't have been five. It should have been zero. Okay. Tell me about the prejudgment interest, New York law applying versus Pennsylvania law. Okay. I'm going to tell you that I don't know the answer. We have a traveler's case. I mean, that's a point of reference, right? Pardon me? Our traveler's case? Yes. Ann, I'm going to discuss that with you. And that is a point of reference. And where it gets complicated or where it gets, let's say, less clear, is on the issue of what do you do with a quasi-contract. I think this court would know what to do with a contract case. I think this court would know what to do with a tort case. The issue is what do you do with a quasi-contract case. I mean, isn't the real key whether we limit Yohannan to being a Rule 238 case? Yes. And in light of travelers, do you do that? And then in light of travelers, if you do that and you now say, okay, well, we're going to apply the substantive law of New York, well, in a quantum Merowith case, I guess the argument can be made that it's not a contract case. Well, in this case, here's what the judge did in this case. Well, wait a minute. Before you get what the judge did, travelers would say that a law is substantive if it serves a compensatory purpose, and that's what quantum Merowith seems to do. Right, right. Isn't that your answer? Yes. Isn't that your argument? That is my argument. And that's the argument I made. It's not clear. I mean, travelers doesn't say, and this applies to quasi-contract too. No, but it says, I mean, is this case more like a contract or a tort? It's more like a contract case. That's your answer. Also, on the credibility issue, the court found Mr. Contenados credible and said so in its opinion on the issue, on the tolling issue, and believed his testimony regarding the tolling issue. So we've got a credibility case here that Magistrate Hart had in front of him on critical issues. The critical issues that Judge Hart found credibility in our favor and against them was the three issues that I mentioned with Dr. Sprayas, and also on the tolling issue with Contenados. And I don't have anything else to say. Questions? Questions? No. Thank you. Thank you. Ms. Hitchcock on rebuttal. Thank you, Your Honor. First of all, I can address a couple of the questions that you asked here. One was about, at different points in time, how much money would have been at issue. In October 1998, we know that $100,000 had been spent. In 2004, which is when the statute of limitations ran, there were products that had been produced, and if you were to take the one and a quarter percent of that, it would have given him about $51,000. So had he brought suit within the statute of limitations, he would have recovered something, but it wouldn't have made him rich. So that justifies his waiting, because if the statute runs from the time when they were unjustly enriched, then it really didn't run until later as to the big bucks. Is that correct? No, Your Honor. It can't possibly do that, because it is a fair fee for the introduction. And it says, should an agreement consummate, you will be paid at that point. But if the claim is unjust enrichment, don't we have the Grinberg case that talks about the fact that you really – I mean, if they had gotten the money, if Hygrosol had gotten the money and paid him, then that would have been fine. But when they failed to pay him over time, that's when the cause of action accrued, because that's when they failed to pay him. No, Your Honor. And actually, the Grinberg case, we cited back the Colorado case in that. The Second Circuit has now dealt with the assignment of those claims, and unfortunately it lists probably 15 cases where Grinberg is asking for money. And in the Second Circuit case, which came out after our briefing, the court talked about Golden Pacific specifically and said that that's conflating the damages for unjust enrichment with the wrongful act. Even assuming arguendo, the total has yet to pay itself any money, the wrongful act that gives rise to the claim for unjust enrichment here was the misappropriation of Grinberg's confidential information, not the payment of money for use of that information. Is this a case cited in your briefing? It came out after our – All right. Well, let us file 28J letters or let us know if you're going to argue. That's fine. I was just shepherdizing Grinberg, Your Honor. But that is the case here. He says, I will pay a fee if there's an agreement that consummates. That's what the value is to me. The valuable thing is can there be an agreement. Well, the district court, you've said over and over in your papers that the only obligation the district court found was the obligation to pay a fee for an introduction. That's correct. Or facilitating a meeting. But the district court was more generous than that. It found that the subject matter of the transaction upon which the fee was claimed was the development of the first five products as well as the introduction. Your Honor, not from the September letter. At that point, that's what the district court found. Whether he was right or wrong, it was not. He didn't only find the fee was based on the introduction. Would you agree with that? I think that the district court said that the services were the services under the 1997 letter, which was the introduction. And the 4798 draft. Is what he used to value those services. He was trying to link them together to get around the statute of frauds by having linked notes or memoranda under Justice Sotomayor's opinion in Springhill. Your Honor, very quickly on prejudgment interest. This court has, and actually Judge Chigueras and Judge Barry, both of you have wrestled with these issues. Where the issue of compensation is different from the question of whether something is an element of damages. And what Travelers says is that under Pennsylvania law, we have taken contract interest and made it an element of damages. Because it is such a matter of right that if it's not awarded, all you have to do is hand a piece of paper to a prothonotary and say, add my 6%. And the prothonotary, as a ministerial act, is required to do that. Now that is not the case in a tort case. And it most certainly is not the case where you have absolute discretion under both New York law, under the statute itself, and under Pennsylvania law to shape a discretionary award of prejudgment interest. Well, there may be discretion, but if New York law applies, which Travelers seems to say it should, wouldn't we then remand for the district court to say, listen, you're not at a 6% limit. You're up to 9%. So if you want to redo it, you know, it is your discretion. You can stay at 6% or whatever. Actually, Your Honor, I believe that's what the court did. The court said, I have discretion. And he felt Pennsylvania law applied. But I think the court did not have Travelers. He did not have Travelers. But I think he determined that the 6% rate was a proper rate. In part, he had brought this case in the forum. He chose the forum. He had brought this case against a company that is a Pennsylvania company. And therefore, 6% would have been an anticipated rate. He recognized that he had the discretion to deny prejudgment interest altogether. The fact that he chose a compromised rate of interest, I don't think Travelers changes that because Travelers is dealing with a situation where the prejudgment interest and its rate are mandatory as an element of damages. But didn't Judge Hart believe Pennsylvania law applied? I believe what he said is that he would look at the law of the forum. And in looking at the law of the forum, that he had discretion. So he could have chosen the 9% as a matter of discretion. But he chose not to. But I don't know that discretion in that way lets you go above the law of the forum. To me, that would seem to be the outside limit. Actually, Your Honor, I believe it's the Sack v. Fineman, which is the case that he was looking to under Pennsylvania law. It says that your discretion allows you to go above as well as below. All right. Thank you, Your Honor. Thank you, counsel. The case was well argued. We'll take it under advisement and ask the clerk to recess court. Please rise.